FILED
RICHARD W. NAGEL
CLERK OF COURT

2018 JUL 26 PM 3:42

U.S. DISTRICT COURT
SOUTHERN. DAYTON

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

PETER K. NEWMAN                          :          Case No: **3:18 cv 252**
594 Garden Road
Dayton, OH 45419                         :

        Plaintiff,                       :

  v.                                   :

UNIVERSITY OF DAYTON                     :          **COMPLAINT**
Acme Agent, Inc.                                    **AND JURY DEMAND**
41 S. High Street, Suite 2800            :
Columbus, OH 45469,

                                 :

KAREN T. DUNLEVEY                        :
Jackson Lewis P.C.
PNC Center, 26th Floor                   :
201 E. Fifth Street
Cincinnati, Ohio 45202                   :

       and                            :

                                   :

JACKSON LEWIS P.C.                       :
PNC Center, 26th Floor
201 E. Fifth Street                      :
Cincinnati, Ohio 45202,

        Defendants.                      :

Plaintiff, Peter Newman, for his Complaint against the University of Dayton ("UD" or "University"), Karen T. Dunlevey, and Jackson Lewis P.C. ("Jackson Lewis') alleges as follows:

### THE PARTIES

1.     UD is a private Roman Catholic university that was founded in 1850 by the Society of Mary (Marianists). The University has about 8,000 undergraduate and 2,200 post-graduate students. UD hired Defendants Dunlevey and Jackson Lewis, P.C. to defend it

1

against two Ohio Civil Rights Commission ("OCRC") discrimination charges which Plaintiff filed against the University (Peter K. Newman v. University of Dayton, Charge No. DAY76(26265)02282017; 22A-2017-01567C alleging employment discrimination and Peter K. Newman v. University of Dayton, Charge No. DAY76(26268)03012017; 22A-2017-01512F alleging denial of public accommodations). UD also hired Defendants Dunlevey and Jackson Lewis to defend it and eleven individual defendants against a federal court lawsuit Plaintiff filed (Peter Newman v. University of Dayton, et al, No. 3:17-cv-00179 (S.D. Ohio)).[1] Plaintiff's complaint in this lawsuit alleged that UD and the individual defendants repeatedly retaliated against him for engaging in protected activities, discriminated against him and harassed him because of his sex, race, and age, denied him public accommodations, violated Title IX, and committed workplace torts.

2.  Karen T. Dunlevey is a partner with Jackson Lewis, P.C..

3.  Jackson Lewis P.C. is a national labor and employment law firm with offices in both Dayton and Cincinnati, Ohio.

## JURISDICTION AND VENUE

4.  This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

5.  Venue is proper under 28 U.S.C. §1391(b)(1)(2).

---

[1] After the District Court granted Defendants' Motion to Dismiss based on judicial estoppel, Plaintiff appealed the District Court's decision to the Sixth Circuit. (Peter Newman v. University of Dayton, et. al, Sixth Circuit Case No. 17-4241). Plaintiff's appeal is pending.

## STATEMENT OF FACTS

6.       Attached are copies of UD's policies and procedures that are relevant to Plaintiff's claims:

Nondiscrimination and Anti-harassment Policy

Mandatory Reporting Policy

How the University of Dayton Equity Complaint Process Works

Equity Complaint Process in Detail

Frequently Asked Questions

**Facts regarding the pattern and practice of retaliatory harassment that lead up to Plaintiff filing his original two OCRC charges against UD.**

7.       Plaintiff worked as an Adjunct Professor at UD from 2014 to 2017. He taught Corporate Compliance, Risk Management and Ethics at the School of Law, Advanced Business Law for Accountants in UD's MBA Program, and The Legal and Ethical Environment of Business ("Business Law") at the School of Business Administration (SBA).

8.       On September 16, 2016, Plaintiff filed an internal discrimination and harassment complaint against a female African American law student - Bridget Jackson - with Interim Title IX Coordinator Kimberly Bakota.

9.       In retaliation for Plaintiff's filing of his complaint against Jackson and for complaining about Interim Title IX Coordinator's inadequate investigation of his complaint, UD, through its employees, placed an unnecessary mutual contact order on him, did not renew his teaching contract for the Spring, 2017 Semester, took down his UD Community Profile from UD's Porches email website after it had been posted for a very short period of time, issued him two disciplinary warnings that were based on false accusations that Plaintiff had engaged in

3

inappropriate behavior, and told him that the decision not to renew his teaching contract for the Spring would not be reconsidered.

10.     In retaliation for Plaintiff's asking UD to mediate his retaliation, discrimination, and harassment claims, UD, through its employees, instructed Professor Brian LaDuca not to move forward with developing a proposed new course with Plaintiff even though UD President Eric Spina had requested LaDuca to work with Plaintiff on this course, informed Plaintiff that there would not be a teaching position for him either during the Summer or Fall, told Plaintiff that "since your time at UD had come to an end" to remove his personal belongings from the adjunct professor office and to turn in his keys, withdrew a previous offer to act as a positive reference for Plaintiff if he decided to pursue teaching opportunities at other educational institutions, kicked him out of the law library, and Law School Dean Strauss banned Plaintiff from visiting the law building until after Jackson graduated and finished studying for the Summer bar exam.

11.     In retaliation for Plaintiff's filing an internal retaliation complaint with new Title IX Coordinator Amy Zavadil and asking her to remove Dean Strauss' unnecessary and retaliatory ban, UD, though its employees, dismissed Plaintiff's retaliation claim without investigating it, refused to remove Dean Strauss' ban,  and treated Plaintiff less favorably than similarly situated former employees and former students by deactivating his UD gmail account while permitting former employees and former students who had not engaged in protected activities, like Plaintiff, to keep their UD gmail accounts.

12.     In retaliation for his OCRC  filing discrimination charges, UD, through its employees, denied Plaintiff's request to be paid a $5,000 stipend which he had been promised for working as a Research Fellow on a Forced Labor Project, did not approve paying Plaintiff a $50 stipend he had been promised for attending an adjunct faculty teaching workshop, and banned Plaintiff from visiting its campus.

13.     In addition to retaliating against Plaintiff, UD, through its employees discriminated against Plaintiff based on his age by not renewing his teaching contract for the Spring, 2017 Semester and then replacing him with a younger in-house counsel who had never taught the business course before compared with Plaintiff who had taught this course ten times.

4

14.     UD, though its employees, unlawfully denied Plaintiff public accommodations in violation of the Ohio Civil Rights Act when it kicked him out of the law library, banned him from visiting the law building until after Jackson finished studying for the Summer bar exam, and deactivated his UD gmail account.

**Facts regarding Defendants UD, Dunlevey, and Jackson Lewis' pattern and practice of retaliatory harassment in response to Plaintiff's federal lawsuit.**

15.     On May 19, 2017, Plaintiff filed his federal lawsuit against UD and eleven individual defendants.

16.     In retaliation for Plaintiff's filing his lawsuit, UD, through its agents Defendant Dunlevey and Jackson Lewis, aided and abetted in discriminating against Plaintiff by extending the University's campaign of retaliation against Plaintiff to the lawsuit.

17.     Defendants Dunlevey and Jackson Lewis crossed the line of "zealous advocacy" when Ms. Dunlevey: (a) tried to tortiously interfere with Plaintiff's agreement with the Chapter 13 Bankruptcy Trustee regarding Plaintiff's approved bankruptcy plan; (b) falsely accused Plaintiff of violating Rule 11 of the Federal Rules of Civil procedure; and (3) threatened Plaintiff with criminal charges in order to improperly gain leverage in this civil suit.

**Facts regarding Defendants UD, Dunlevey, and Jackson Lewis' pattern and practice of retaliatory harassment when Ms. Dunlevey extended the ban which Law School Dean Andrew Strauss had previously placed on Plaintiff.**

18.     On January 10, 2017, Dean Strauss banned Plaintiff from the University's law library and law building until Bridget Jackson, the law student against whom Plaintiff had filed a Title IX discrimination and harassment complaint, graduated and finished studying for the Summer Ohio bar exam.

5

19.     After these two conditions were met, Plaintiff emailed Dean Strauss asking him to confirm that his ban was now lifted.

20.     In her July 31, 2017 email response, Ms. Dunlevey extended the ban indefinitely and extended it to cover all of the University's campus.

21.     Ms. Dunlevey gave a conflicting explanation for the ban: "Students and employees of the University have expresses concerns regarding inappropriate behavior from you. For these reasons, you are no longer welcome on campus."

**Facts regarding Defendants UD, Dunlevey, and Jackson Lewis' pattern and practice of retaliatory harassment when Ms. Dunlevey lied to the Ohio Civil Rights Commissioners during their February 1, 2018 hearing on Plaintiff's request for reconsideration regarding his employment discrimination charge**

22.     The OCRC Dayton Regional Office issued a no-probable-cause determination regarding Plaintiff's employment discrimination charge.

23.     Subsequently, Plaintiff filed a timely application for reconsideration regarding the Dayton Regional Office's determination.

24.     During the Commission's February 1, 2018 meeting, the Commissioners heard oral arguments from Reconsideration Supervisor Vera Boggs, Plaintiff, and Defendant Dunlevey on Plaintiff's application for reconsideration.

25.     During her oral argument, Ms. Dunlevey tried to reconcile the two conflicting explanations Jay Janney, Chair of the Management and Marketing Department, had given to Plaintiff for the decision not to renew his teaching contract. Janney had initially told Plaintiff that the decision not to renew his contract was made because every since he became the Department Chair, the Department has been moving towards using in-house counsel to teach the Business

6

Law classes. But shortly thereafter, Janney changed his explanation telling Plaintiff that the real reason for his decision was that Plaintiff had turned in his Summer, 2016 grades for his online Business Law class in late. Ms. Dunlevey presented a third conflicting explanation: because Plaintiff had submitted his Summer grades late due to his busy law practice, UD decided in August, 2016, to stop using outside lawyers as adjunct professors.

26.    Following the oral argument there was a brief question and answer period. In an apparent attempt to find an excuse to deny Plaintiff's application for reconsideration, Commissioner William Patmon, III asked Dunlevy if this new alleged policy about not using outside lawyers as adjunct professors was directed just at Plaintiff or if it was implemented university-wide. In response, Dunlevey lied when she said that that UD had implemented this new policy university wide. In response to this exchange, Plaintiff raised a disputed issue of fact by pointing out that contrary to Dunlevey's assertion, Mr. Janney had scheduled Tim Wood, an outside lawyer, to teach two or three Business Law classes every semester since August, 2016. Dunlevey's assertion that she "did not know whether Tim Wood was an outside lawyer", was disingenuous because she went through a 2002 divorce proceeding in Montgomery County Domestic Relations Court (Case No. 2002 DM 00570) where Tim Wood has been a judge for many years. In fact, in his current Court biography, Wood lists as one of his activities "Adjunct Professor, University of Dayton."

27.    Despite this disputed issue of fact regarding Plaintiff's application for reconsideration of his employment discrimination charge, the Commissioners voted 4-1 to deny Plaintiff's application for reconsideration.

7

28.     Following the Commission's February 1, 2018 meeting, Plaintiff obtained  copies of the

class schedules for the Business Law class (MGT 201) he used to teach and confirmed what he had pointed

out during the oral argument: since August, 2016, Jay Janney had scheduled Tim Wood - an outside lawyer

- to teach two or three MGT 201 classes every semester.

29.     Plaintiff also investigated UD School of Law's use of outside lawyers as adjunct professors.

Plaintiff obtained a copy of the current UD School of Law Adjunct Faculty Directory which lists 64 names,

the majority of whom are outside lawyers. He also obtained copies of the 2017 and 2018 Course Grids

which show the School of Law's extensive use of outside lawyers as adjunct professors.

30.     In addition, Plaintiff checked the firm biography of Gretchen M. Treherne, Ms. Dunlevey's

co-counsel in defending UD against Plaintiff's federal employment discrimination lawsuit. Treherne's

biography states that she "has been an adjunct professor at the University of Dayton School of Law,

teaching classes in appellate advocacy and commercial drafting."


**Facts regarding Defendants UD, Dunlevey, and Jackson Lewis' pattern and practice of
retaliatory harassment when Ms. Dunlevey lied to the Ohio Civil Rights Commissioners
during their February 1, 2018 hearing on Plaintiff's request for reconsideration regarding
his denial of public accommodations charge**

31.     The OCRC Dayton Regional Office issued a no-probable-cause determination

regarding Plaintiff's denial of public accommodations charge.

32.     Subsequently, Plaintiff filed a timely application for reconsideration regarding

the Dayton Regional Office's determination.

33.     During the Commission's February 1, 2018 meeting, the Commissioners heard oral arguments from Reconsideration Supervisor Vera Boggs, Plaintiff, and Defendant Dunlevey on Plaintiff's application for reconsideration.

34.     Following the oral argument there was a brief question and answer period. Commissioner William Patmon, III told Ms. Dunlevey that he was very concerned about any university banning someone from its facilities unless it had a compelling reason for doing so. Then, in an apparent attempt to find an excuse to deny Plaintiff's application for reconsideration, Commissioner Patmon asked Dunlevy if UD's bans on Plaintiff were based on a "safety concern." Dunlevey lied when she said "yes." In response to this exchange, Plaintiff raised a disputed issue of fact by pointing out that when Law School Dean Strauss banned him from the law library and the law building and when General Counsel Reeker banned him from UD's campus, neither Strauss nor Reeker raised any "safety concern."

35.     Despite this disputed issue of fact regarding UD's new conflicting "safety concern" explanation for the bans it placed on Plaintiff, the Commissioners voted 4-1 to deny Plaintiff's application for reconsideration.


**Fact regarding Plaintiff's filing his three discrimination charges against Defendants UD, Dunlevey and Jackson Lewis for engaging in a pattern and practice of retaliatory harassment against him and his filing this Complaint**

36.     On March 9, 2018, Plaintiff filed OCRC discrimination charges against the three Defendants alleging that they had engaged in a pattern and practice of retaliatory harassment against him.

37.     Subsequently the OCRC forwarded Plaintiff's three charges to the EEOC for investigation.

38.     On April 27, 2018, the EEOC Cincinnati Area Office closed its files on Plaintiff's three charges and issued him three 90-day right to sue notices.

39.     Plaintiff filed the instant Complaint within the 90-day filing periods established by the right to sue notices.

### FIRST CAUSE OF ACTION
### Pattern or Practice of Retaliatory Harassment
### (Against all of the Defendants)

40.     Plaintiff realleges and incorporates all of the allegations in the Paragraphs 1-39 of this Complaint as if fully rewritten herein.

41. Discriminatory acts that are part of a pattern or practice of discrimination can be challenged as a single act. If the discriminatory pattern or practice continues into the filing period, all of the component acts of the pattern or practice will be timely, and relief can be recovered for any of those acts. EEOC COMPLIANCE MANUAL, Section 2-IV TIMELINESS, C. When Can a Discriminatory Act Be Challenged ?, Pattern-or-Practice Claims. https://www.eeoc.gov/policy/docs/threshold.html#2-IV-C.

42.     The EEOC's position is that a pattern or practice of discrimination should be considered a single unlawful employment practice, and not a series of discrete acts, each of which must be challenged within the charge filing period. Akin, Gump, Strauss, Hauer & Feld, LLP, EEOC Pattern or Practice Litigation, ABA National Conference on EEO Law, March 23-27, 2010 at 4.

43.     As explained in the EEOC's Enforcement Guidelines on Retaliation and Related Issues (https://www.eeoc.gov/laws/uidance/retaliation-guidance.cfm#3_Harassing), at Section II, B, 3, Harassing Conduct as Retaliation, sometimes retaliatory conduct is characterized as 'retaliatory harassment." The threshold for establishing retaliatory harassment is different than for discriminatory hostile work environment. Retaliatory harassing conduct can be challenged under the standard announced in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006) ("the Burlington Northern standard"), even if it is not severe or persuasive enough to alter the terms and conditions of employment. If the conduct would be sufficiently material to deter protected activity in the given context, even if it were insufficiently sever or persuasive to create a hostile work environment, there would be actionable retaliation.

44.     Discriminatory acts that are part of a pattern or practice of discrimination can be challenged as a single act. If the discriminatory pattern or practice continues into the filing period, all of the component acts of the pattern or practice will be timely, and relief can be recovered for any of those acts.

45.     A covered entity is as liable for the actions of its agents as it would be for actions taken by itself. An agent is an individual or entity having the authority to act on behalf of, or at the direction of, the covered entity. EEOC COMPLIANCE MANUAL, SECTION 2: THRESHOLD ISSUES, 2-III COVERED PARTIES, 2. Agents.

46.     An entity that is an agent of a covered entity is liable for the discriminatory actions it takes on behalf of the covered entity.

47.     Applying the above guidelines to the facts of this case, Plaintiff can prove a pattern-or-practice claim for retaliatory harassment against Defendants UD, Karen Dunlevey, and Jackson Lewis.

48.     As discussed in the above Statement of Facts, UD, through its employees and agents, including Karen Dunlevey and her law firm, Jackson Lewis, engaged in a pattern or practice of retaliatory harassment against Plaintiff.

49.     Plaintiff's three discrimination charges against UD, Karen Dunlevey, and Jackson Lewis alleging a pattern-or-practice of retaliation were timely filed because all of the retaliatory acts are part of the same unlawful pattern or practice and at least three of the retaliatory acts fall within the 300-day filing period.

50.     Because Ohio has a state fair employment practices agency (FEPA) - the Ohio Civil Rights Commission (OCRC), Plaintiff had to file my charges against UD, Karen Dunlevey, and Jackson Lewis with the EEOC or the OCRC within 300 days of their Title VII violations. Plaintiff filed my charges on March 9, 2018. Looking back 300 days is May 11, 2017. Based on the above chronology, the following retaliatory acts fell within this filing period (May 11, 2017 - March 9, 2018):

7/14/2017     Ms. Dunlevey's misconduct in connection with her filing Defendants' Motion to Dismiss Plaintiff's lawsuit.

7/31/2017     Ms. Dunlevey provided a conflicting explanation for Dean Strauss' retaliatory ban and extended the ban indefinitely to cover all of UD's campus.

2/1/2018     During the oral argument before the OCRC on Plaintiff's two applications for reconsideration regarding Plaintiff's employment discrimination and denial of public accommodations charges, Ms. Dunlevey told two lies to cover up UD's retaliatory reasons for not renewing Plaintiff's teaching contract, ending his UD teaching career, and forever banning him from it's campus.

**12**

51.    Because these three retaliatory acts committed by Ms. Dunlevey and Jackson Lewis - UD's agents - fall within the applicable filing period, Plaintiff's charges alleging a pattern-or-practice of retaliatory harassment are not time barred. See Bena v. United States Postal Service, EEOC Appeal No. 01A33825 (May 19, 2004) (The Commission found that allegations, which were part of a claim of harassment, were timely under National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002). Accordingly, EEOC noted that a complaint alleging a hostile work environment will not be time barred if all acts are part of the same unlawful practice and at least one of the acts falls within the filing period.).

52.    Plaintiff suffered and continues to suffer materially adverse actions as a result of Defendants' pattern-or-practice of retaliatory harassment. Plaintiff suffered work-related materially adverse actions because UD did not renew his adjunct teaching contract for the Spring, 2017 semester, terminated his teaching career at UD, and forever banned him from its campus.

53.    Plaintiff has also suffered materially adverse actions that are not work related. Ms. Dunlevey disparaged Plaintiff to others when she changed the reason for Dean Strauss' retaliatory ban by falsely telling others that students and employees of the University have expressed concerns regarding inappropriate behavior from me. See EEOC Enforcement Guidance on Retaliation and Related Issues, II. ELEMENTS OF A RETALIATION CLAIM, B. Materially Adverse Action, 3, Actions That Are not Work-Related, Additional Examples.

54.    Ms. Dunlevey also made false reports to a governmental authority when during oral argument before the OCRC she told two lies to cover up UD's retaliatory reasons for its adverse actions. As discussed above, Ms. Dunlevey lied when she said that in August, 2016, UD had adopted a university-wide policy to stop hiring outside lawyers as adjunct professors. She also lied when she told the Commission that all of the bans which UD placed on me were based on safety concerns about Plaintiff.

See EEOC Enforcement Guidance on Retaliation and Related Issues, II. ELEMENTS OF A

RETALIATION CLAIM, B. Materially Adverse Action, 3, Actions That Are not Work-Related, Additional

Examples.

55.    In addition, Plaintiff has suffered a materially adverse action because Respondent's

pattern-or-practice of retaliation constitutes "retaliatory harassment" as defined by the EEOC Enforcement

Guidance on Retaliation and Related Issues. See ELEMENTS OF A RETALIATION CLAIM, B. Materially

Adverse Action, 3. Harassing Conduct as Retaliation.


56.    As a proximate result of Defendants' retaliation, Plaintiff has suffered damages for which he

is entitled to all of the appropriate remedies available to him.


**SECOND CAUSE OF ACTION**
**Aiding and Abetting Discrimination in Violation of the Ohio Civil Rights Act**
**(Against All of the Defendants)**

57.    Plaintiff incorporates by reference Paragraphs 1-56 as if fully rewritten herein.


58.    Ohio Rev. Code Section 4112.02 provides, in pertinent part, that:


It shall be an unlawful discriminatory practice:

*               *               *

(J)    For any person to aid, abet, incite, or coerce the doing of any act declared by this
       section to be an unlawful discriminatory practice ….

59.    In Genero v. Central Transport, Inc. (1999), 84 Ohio St.3d 293,  703 N.E. 2d 782 (Ohio

1999), the Ohio Supreme Could ruled that the plain language of Chapter 4112, particularly the definition of

**14**

"employer", imposes individual liability for discriminatory conduct. Ohio Rev. Code Section 4112.01 (A)(2) defines "employer" to include "any person acting directly or indirectly in the interest of the employer."

60.     Defendants Dunlevey and Jackson Lewis aided and abetted UD in engaging in a pattern-or-practice of retaliatory harassment against Plaintiff.

61.     As a proximate result of the individual Defendants aiding and abetting retaliation, discrimination, and the denial of public accommodations, Plaintiff has suffered damages for which he is entitled to all of the appropriate remedies available to him.

### THIRD CAUSE OF ACTION
### Breach of an implied contract
### (Against Defendant UD)

62.     Plaintiff incorporates by reference Paragraphs 1-61 as if fully rewritten herein.

63.     Ohio courts recognize implied contract as an exception to the employment-at-will doctrine. Whether explicit or implicit contractual terms have altered an at-will-employment agreement depends upon the history of the relations between the employer and employee, as well as the facts and circumstances surrounding the employment relationship. Wright v. Honda of Am. Mfg., Inc., 73 Ohio St. 3d 571, 574, 1995-Ohio-114, 653 N.E. 2d 381. The relevant facts and circumstances include "the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question * * *." Mers v. Dispatch Printing Co., 19 Ohio St.3d 100, 483 N.E.2d 150 (1985), paragraph two of the syllabus. See also Kelly v. Georgia-Pacific Corp., 46 Ohio St.3d 134, 545 N.E.2d 1244 (1989), paragraph two of the syllabus.

64.     The attached copies of UD's Nondiscrimination and Anti-harassment Policy, Mandatory Reporting Policy, and Equity Complaint Process for Resolving Complaints of Harassment, Sexual Misconduct and other Forms of Harassment constitute an implied contract of employment.

65.     UD's policies do not contain employment -at-will disclaimers that would preclude Plaintiff's use of these policies to demonstrate an implied contract of employment.

66.     Plaintiff can establish all the elements for a breach of an implied contract of employment claim because: (1) he had an implied contract of employment; (2) he performed his obligations under this contract; (3) UD materially breached the contract; and (4) plaintiff has suffered damages.

67.     As a result of UD's breach of Plaintiff's implied contract of employment, Plaintiff has suffered and continues to suffer damages for which he is entitled to all of the appropriate remedies available to him.

### FOURTH CAUSE OF ACTION
### Misrepresentation and fraud
### ( Against Defendant UD)

68,     Plaintiff incorporates by reference Paragraphs 1-67 as if fully rewritten herein.

69.     In its Nondiscrimination and Anti-harassment Policy, Mandatory Reporting Policy, and Equity Complaint Process for Resolving Complaints of Harassment, Sexual Misconduct and other Forms of Harassment, UD made representations to all of its employees, including Plaintiff, that UD would protect them against retaliation, discrimination, and harassment.

70.     UD's "Commitment to Community", which highlights three principles adopted from the Catholic and Marianist vision of education, shapes UD's policies. The three principles - "the dignity of every person", "the common good", and "community is essential for learning" - provide the foundation of

UD's mission statement and aims as an educational institution. The influence of these principles can be found throughout the University's policies, behavioral expectations for students, and academic curriculum.

71.    UD's representations were falsely made, with either knowledge of their falsity, or with disregard as to whether they were true or false.

72.    UD, through its employees, has committed the tort of intentional misrepresentation under Ohio law.

73.    UD, though its employees, has also committed the tort of fraud under Ohio law.

74.    As a result of UD's intentional misrepresentation and fraud, Plaintiff has and continues to suffer damages for which he is entitled to all of the appropriate remedies available to him.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against UD, and its employees,  Karen Dunlevey, and Jackson Lewis as follows:

(a)    Order requiring UD to rehire Plaintiff to a tenured professor position teaching the classes he has taught in the past and where he would be protected from future acts of retaliation, discrimination, and harassment.

(b)    Pay Plaintiff back pay for the six classes he would have taught but for Defendants' retaliation, discrimination, and harassment.

(c)    Cover all of Plaintiff's expenses to attend the Designing Your Life (DYL) teacher workshop

**17**

at Stanford University and schedule Plaintiff to teach UD's version of the DYL course starting in the Fall, 2017 semester.

(d) For actual, special, and compensatory damages in an amount to be determined at trial but in no event less than $350,000.

(e) For punitive damages in an amount sufficient to deter UD and its employees from engaging in similar retaliatory, discriminatory, and harassing conduct in the future but in no event less than $700,000.

(f) Order UD to expunge Plaintiff's official personnel file and any and all other files kept on Plaintiff related to the retaliatory, discriminatory, and harassing actions the individual Defendants took against Plaintiff.

(g) Order Karen Dunlevey and each UD's employees who participated in the pattern-or-practice of retaliatory harassment against Plaintiff to attend remedial training on what constitutes unlawful retaliation, discrimination, and harassment under federal and Ohio law and what preventive measures they need to take to avoid engaging in such illegal activity.

(h) Order Kimberly Bakota, Christine Schramm, Carolyn Phelps, Andrew Strauss, Amy Zavadil, and Mary Ann Recker to attend remedial training regarding what a Title IX coordinator's responsibilities are, what elements a school's Title IX investigation should include, how a school should determine whether to take interim measures before the completion of its investigation, and how to satisfy the OCR's guideline that "a school's Title IX investigation must be adequate, reliable, impartial, and prompt and include the opportunity for both parties to present witnesses and other evidence.

(i)      Pre-judgment interest and post-judgment interest.

(j)      Attorneys' fees and costs.

(k)      Such other and further relief as this Court may deem just, proper, equitable, and appropriate.

Dated: July 26, 2018

/s/ Peter K. Newman
Peter K. Newman (0010468)
**THE NEWMAN LAW GROUP LLC**
594 Garden Road
Dayton, OH 45419
Ph: 937.475.6282
Email: newmanlawgroup@gmail.com

Attorney for Plaintiff

**JURY DEMAND**

Plaintiff demands a trial by jury

/s/ Peter K. Newman
Peter K. Newman (0010468)

19

## ATTACHMENTS

### UD's Policies and Procedures Relevant to Plaintiff's Claims

**UD's Nondiscrimination and Anti-harassment Policy**

**Purpose**

The Marianist vision of community living embraced by the University of Dayton is based on the conviction that every person has innate dignity because all people are made in the image and likeness of God. This conviction is rooted in the following verse: "The dignity of the human person is rooted in [the person's] creation in the image and likeness of God; it is fulfilled in [the person's] vocation to divine beatitude. . . . The divine image is present in every person. It shines forth in the communion of persons, in the likeness of the unity of the divine persons among themselves." (Catholic Catechism, 1700, 1701). A primary assertion of both our religious and civil traditions is the inviolable dignity of each person. Recognition of and respect for the person are central to our life as a Christian and educational community and are what allow us to pursue our common mission while being many diverse persons. Thus, discrimination, harassment, or any other conduct that diminishes the worth of a person is incompatible with our fundamental commitment as a Catholic university conducted in the Marianist tradition, and therefore is prohibited by the University.

**Scope**

Faculty, staff, students, visitors, non-employees, volunteers, contractors and consultants.

**UD's Mandatory Reporting Policy**

**Purpose**

This document outlines the University's policy regarding mandated reporting of suspected discrimination, including harassment, based on membership in a protected class. This policy is in place to make the University community aware of one's mandatory duty to report possible discrimination and the process for doing so. Sexual harassment, which includes acts of sexual violence, is a type of sex discrimination.

**20**

**Scope**

This policy applies to the entire University of Dayton community including faculty, staff, students, volunteers, and contractors.

*          *          *

**Definitions**

(a) "Discriminatory Harassment" is harassment based upon an individual's actual or perceived membership in a protected class. Harassing conduct may take various forms, including, name-calling, graphic or written statements (including the use of cell phones or the Internet), or other conduct that may be physically threatening, harmful, or humiliating.

(b) "Equity Compliance Officer" is the individual responsible for tracking and overseeing reports and complaints of discrimination and harassment and also serves as the University's Title IX Coordinator.

(c) "Protected class" means age, race, color, creed, religion, ancestry, national or ethnic origin, sex/gender, gender identity, sexual orientation, disability, genetic information, military status, veteran status, familial status or any other protected category under applicable local, state or federal law, ordinance or regulation.

(d) "Responsible Employee" is any employee who meets at least one of the following criteria: (1) has the authority to take action to redress sexual violence or other misconduct; (2) has been given a duty of reporting incidents of sexual violence or other misconduct to the Title IX Coordinator or designee; or (3) is an employee whom an individual could reasonably believe has the above authority or duty.

*          *          *

**Policy**

**APPLICABLE LAWS**

There are three federal laws that establish responsibilities for employees of universities to report certain types of crimes and incidents, especially sexual misconduct—the Clery Act, Title VII, and Title IX. Each of these areas of federal law has a different purpose, but generally, the laws are intended to protect members of the University community, visitors and guests from criminal and discriminatory behavior. The responsibilities established by these laws give rise to the terms "mandatory reporter" and "responsible employee."

**21**

**YOUR DUTY**

To make it easier to know what you need to do, the University has adopted a policy that defines ALL EMPLOYEES as mandatory reporters EXCEPT doctors, counselors, and ordained members of the clergy acting in that capacity. As a mandatory reporter, if you become aware of possible discrimination, including harassment, you MUST promptly inform the University within one (1) business day by contacting the Title IX/504 Coordinator and Equity Compliance Officer or one the deputy coordinators listed in the table that follows. Reporting is required regardless of whether the discrimination involves students, faculty, staff, or visitors to the University.  Fulfilling the duty to report does not entitle the reporter to receive a notice of outcome unless the reporter is the alleged victim or respondent.

**REPORTING GUIDELINES**

**How to Report**

You may report in person, by email, by phone, or electronically by using the Harassment and Discrimination Incident Report Form found on the Nondiscrimination Resource Center webpage located at: go.udayton.edu/nondiscrimination under the "Complaint, Reporting and Appeal Forms" tab.  This form is also accessible using the Nondiscrimination/Title IX link located in the footer of every University webpage. Mandatory reporters must identify themselves when reporting an incident to the Title IX Coordinator.  Anonymous reporting does not satisfy an employee's duty to report incidents under this policy.

**What to Report**

**Responsible Employee reporting of Title IX (Sex/Gender) based misconduct**

As defined above, any employee with a duty to report incidents to the Title IX Coordinator is considered a responsible employee. As a result, mandatory reporters under this policy are "responsible employees" for purposes of reporting Title IX (sex/gender) based misconduct. When reporting misconduct covered under Title IX (including claims of sexual harassment and sexual violence as defined above, as well as sex/gender discrimination or sexual orientation discrimination), responsible employees must provide full details of the incident, if known, including names of the victim(s), alleged perpetrator(s), witnesses and any other relevant facts, including the date, time and specific location of the incident (if known). If an individual requests confidentiality or requests that no further action be taken, please share that information with the Title IX Coordinator or Deputy Title IX Coordinator at the time you report the incident.

The only exception to the "responsible employee" reporting requirement is that initially, staff members who work for the *University Counseling Center, Health Center, Campus Ministry or Women's Center* are not required to provide any names or personally identifiable information to the Title IX Coordinator unless the disclosing party gives them permission to do so. If, after the initial report is received, it is determined that more information is needed, the staff member will be contacted by the Title IX Coordinator. Your job is to cooperate fully with campus officials, providing any information/details requested.

**Mandatory Reporting of all other Protected Class (NON-Title IX) misconduct**

When reporting Non-Title IX related claims, including all other protected classes as defined above, all mandatory reporters may be able to initially withhold personally identifiable information (the name of the victim, the name of the accused individual, and other identifying details about witnesses, location, etc.), in cases where the alleged victim is hesitant to have a formal report made. Your initial report should include the nature, date, time and general location of the incident. Subsequently, campus officials may need additional information from you. Your job is to cooperate fully with campus officials, providing any information/details requested.

*      *      *

**DESIGNATED REPORTING OFFICES**

**All Complaints and Complaints Against Visitors**

Amy Zavadil, Title IX/504 Coordinator and Equity Compliance Officer
University of Dayton
St. Mary's Hall, Room 300
300 College Park
Dayton, OH 45469-1641
937-229-3615
azavadil1@udayton.edu

**Complaints Against Students**

Christine Schramm, Deputy Title IX Coordinator,
Associate Vice President for Student Development & Dean of Students
University of Dayton
Gosiger Hall, Room 202
300 College Park
Dayton, OH 45469-0965

**Complaints Against Faculty**

Carolyn Phelps, Ph.D., Deputy Title IX Coordinator,
Associate Provost for Faculty and Administrative Affairs
University of Dayton
St. Mary's Hall, Room 212
300 College Park
Dayton, OH 45469-1634
937-229-2245
cphelps1@udayton.edu

                          \*              \*             \*

**Resources**

1. University of Dayton Nondiscrimination and Anti-Harassment Policy
2. University of Dayton Equity Complaint Process for Resolving Complaints of Harassment, Sexual Misconduct and Other Forms of Discrimination

**UD's Equity Complaint Process for Resolving Complaints of Harassment, Sexual Misconduct and other Forms of Discrimination**

**We value the dignity of all.**
**That's why we're committed to ending unlawful**
**Discrimination.**

The Marianist vision of community living embraced by the University of Dayton is based on the conviction that every person has innate dignity because all people are made in the image and likeness of God. This conviction is rooted in the following verse: "The dignity of the human person is rooted in [the person's] creation in the image and likeness of God; it is fulfilled in [the person's ] vocation to divine beatitude. . . . The divine image is present in every person. It shines forth in the communion of persons, in the likeness of the unity of the divine persons among themselves." (*Catholic Catechism*, 1700, 1701).

24

A primary assertion of both our religious and civil traditions is the inviolable dignity of each person.  Recognition of and respect for the person are central to our life as a Christian and educational community and are what allow us to pursue our common mission while being many diverse persons.  Thus, discrimination, harassment, or any other conduct that diminishes the worth of a person is incompatible with our fundamental commitment as a Catholic university conducted in the Marianist tradition, and therefore is prohibited by the University.

**Notice of Nondiscrimination**

As a Marianist institution that values the dignity of all, the University adheres to all federal and state civil rights laws banning discrimination in private institutions of higher education. The University of Dayton does not discriminate on the basis of age, race, color, creed, religion, ancestry, national or ethnic origin, sex/gender, sexual orientation, disability, genetic information, military status, veteran status, familial status or any other protected category under applicable local, state or federal law, ordinance or regulation, including protections for those opposing discrimination or participating in any complaint process on campus or within the Equal Employment Opportunity Commission, Ohio Civil Rights Commission or other human rights agencies, in the planning and administration of its admissions policies, educational programs, scholarships, loans, and other financial aid, athletic and other school-administered programs, services, and activities, or in employment. Sexual harassment, which includes acts of sexual violence, is a type of sex discrimination.  To help combat reported acts of unlawful harassment or discrimination, the University has developed a robust Equity Complaint Process.

*Note:  On this website, "Title IX" stands for Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq., and "Section 504" stands for Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.*

Notice of revision to policy

In accordance with U.S. Department of Education guidelines, the University of Dayton has made revisions to its Title IX policy and procedures as found in the University's Nondiscrimination and Anti-Harassment Policy, the Equity Complaint Process for Resolving Complaints of Harassment, Sexual Misconduct and Other Forms of Discrimination, as well as the Mandatory Reporting Policy.

The revisions include:

- Notice that the University's Title IX Coordinator also serves as the Equity Compliance Officer for the University.
- Indicates that participation in either the pre-complaint process or the informal resolution process is completely voluntary and that the complainant will be informed of his or her right to end either process at any time to access the formal grievance process.
- Gives notice that both parties involved in the complaint process have an equal right to a support person, including a licensed attorney, and clarifies that those individuals serve as advisors, and are not permitted to speak during interviews, hearings or other proceedings.
- Makes explicit that upon request, accommodations can be made if the parties cannot be in the same room with each other during a hearing or when a party needs a modification to be able to participate in the process.
- Clarifies that if sexual harassment is found to have occurred, the Title IX Coordinator and/or Deputy Title IX Coordinator will ensure and document the implementation of steps identified to prevent recurrence of the harassment and remedy the discriminatory effects on the complainant and others, as appropriate.
-

For a complete copy of the policy or for more information, click here or contact the University's Title IX Coordinator at 937-229-3615 or by email at azavadil1@udayton.edu.


RELATED LINKS


**How the University of Dayton**

**Equity Complaint Process Works**

This guide describes how to navigate the equity complaint process. Feel free to contact us with questions.

**STAGE ONE: CONSIDERING YOUR OPTIONS**

You feel as if you are being harassed or otherwise discriminated against by someone because of your gender, race, religion, or membership in some other protected class. What do you do? Sometimes the best answer is to talk to that person, to try to work things out before they go too far. Sometimes simply asking someone to "stop" is enough to get them to stop. For instance, someone might not realize a certain term is offensive. But talking is not always a good idea. Some problems are so serious that you need the University's help. For instance, you cannot "talk out" a sexual assault, and no one would want you to try. If you are not sure whether it would be a good idea to try to resolve a situation on your own, contact the Title IX/504 Coordinator & Equity Compliance Officer ("ECO") for advice. (Click on the "CONTACT US" link for specific contact information.)

**STAGE TWO: ASKING THE UNIVERSITY FOR HELP**

- You might want the University to take official action to remedy the situation. If you have seen or been a victim of an incident of discrimination, you can file a complaint with the ECO asking the University to remedy/fix the situation. Doing so triggers the Equity Complaint Process.

- You might want to talk someone secure in the knowledge that they will not share your story with University officials. In other words, you may not want the University to take action. You may just want to talk to someone. If so, you can contact Campus Ministry, the Counseling or Health Center (if you are a student), or the Employee Assistance Program (if you are an employee) and ask to schedule a meeting with someone with whom you can speak confidentially.

- You might want to seek advice from a professor, supervisor, or another University employee you trust. If that is your choice, you need to know that almost all University employees are required to report incidents of unlawful discrimination or harassment to the University. So, if you talk about an incident with an employee other than a counselor, doctor, etc. that employee must share at least some of what you said with the ECO. If you do not want your name used, tell the employee. The employee will still have to report, but unless the incident involves a danger that could threaten others in the community, he or she will not have to share your name or other identifying information. Of course, the tradeoff for choosing anonymity is if the University does not know who you are, it may not be possible for it to help you.

27

## STAGE THREE: THE UNIVERSITY REVIEWS THE COMPLAINT

The University always acts on a complaint or report of discrimination. But the type of action it takes depends on the facts of each case. When a complaint or report is made the ECO acts as a "gatekeeper." His or her first job is to look at the facts to see if, assuming they are true, they might violate the University's Nondiscrimination and Anti-Harassment Policy. Not every wrongful act is sufficient to violate the policy.

If the answer, is "no," the process/investigation ends. The ECO will let you (the "complainant") and the accused party (the "respondent") know the outcome. If the conduct may violate some other University policy or otherwise merit some action, he or she will pass your complaint on to the right officials. If the answer is "yes," he or she will inform you and the respondent and determine what the next steps should be.

What the next steps are depends on the facts of each case. If the ECO thinks this complaint may be one that could be resolved informally using something like a mediation, and if both parties agree, informal resolution is a possibility.

## STAGE FOUR: THE UNIVERSITY INVESTIGATES THE COMPLAINT

If informal resolution is not a possibility or does not work, the ECO will assign your case to a specially trained investigatory team to investigate the facts. The team will interview you, the respondent, and others with information about what happened. It will also gather other materials (e.g., texts, emails, etc.) that may help show what happened.

Both parties have the option of participating as much or as little in the process as they choose, but choosing not to participate typically weakens that person's case.

The investigatory team will compile all of the evidence it has gathered into a report and will determine whether if all of the evidence is viewed in a light most favorable to you there is probable cause to believe that the

respondent might have violated the University's Nondiscrimination and Anti-Harassment Policy. If the answer is "no," the process will end and the ECO will inform you and the respondent of the outcome.

## STAGE FIVE: THE UNIVERSITY RESOLVES THE COMPLAINT

If the answer is "yes," the next step depends on whether the respondent is a student, employee, or visitor.

- If the respondent is a student, the case file is sent to the Office of Community Standards and Civility for an Accountability Hearing. The Hearing Board will determine by a preponderance of the evidence whether a violation has occurred and will notify you and the respondent of the outcome. See the Student Handbook for more information.
- If the respondent is a University employee (faculty or staff) or a visitor to campus, the investigatory team keeps the case. The investigatory team will determine by a preponderance of the evidence whether a violation has occurred and make recommendations to the appropriate University official as to how to remedy any violation. Once the official has determined whether and how to follow the recommendations, the ECO will notify you and the respondent of the outcome. Neither you nor the respondent will receive a copy of the investigatory report, but you will both be provided with the opportunity to view a notice of outcome that outlines the team's findings. You will also be informed of any actions taken or recommended to resolve the complaint, if any, that are directly related to you, such as a recommendation that the respondent not contact you. The respondent will also be informed of actions taken or recommended to resolve the complaint and will be notified of referrals for disciplinary action and recommended disciplinary action. See the Equity Complaint Process for more information.

## STAGE SIX: THE APPEALS PROCESS

Either party may appeal the findings of the Hearing Board or investigatory team. Findings of the Hearing Board are appealable to the Judicial Review Committee (JRC), and findings of the investigatory team are appealable to the Complaint Review Committee (CRC).

An appeal will be granted only if:

- New evidence or information that did not exist at the time of the hearing or investigation that could have a bearing on the decision is discovered, or
- There was a clear error in the process

If an appeal is denied, both you and the respondent will be notified and the process/investigation will conclude. If an appeal is granted, both you and the respondent will be notified of the corrective action taken by the Review Committee. Once a final decision is made, you and the respondent will be notified. No further appeal will be available.

**Statement of Rights**

**COMPLAINANT'S RIGHTS**

- To be treated with respect by University officials.
- To an investigation and appropriate resolution of all complaints of discrimination and/or harassment made in good faith to the appropriate University official(s).
- To receive written notification that the respondent has been officially notified of the allegation of violating the University's Nondiscrimination and Anti-Harassment Policy.
- To be notified of the substance of respondent's response, if any, to the allegations.
- To take advantage of campus support resources (such as Campus Ministry, the University Health and Counseling Centers for students, and Employee Assistance Program services for employees).
- To experience a safe living, educational and work environment.
- To have a support person of his or her choosing, including, but not limited to, a licensed attorney, during any meeting with investigators. The support person cannot be someone who may be called

- as a witness. The role of the support person is to serve as an advisor. He/she may be present at interviews, hearings and other proceedings, but is not permitted to speak.
- To decline to participate in conflict resolution procedures as the means for resolving an allegation.
- To receive amnesty for minor student misconduct (such as alcohol or drug violations) that is ancillary to the incident.
- To be free from retaliation for complaints made, or otherwise participating in an investigation, in good faith.
- To have complaints heard in substantial accordance with these procedures.
- To full participation in this process, whether the injured party is the actual party or the University has brought the complaint.
- To be informed in writing of the outcome/resolution of the complaint, sanctions where permissible and the rationale for the outcome where permissible.
- The ability to refer to law enforcement and have assistance.
- For residential students, the ability to request housing and living accommodations, if appropriate.
- A "no contact order," if appropriate. A no contact order is an order from a University Official to have no contact with a particular person or persons. Contact is considered any verbal, written, electronic, non-verbal gesture, third party messages, indirect loud talking in the vicinity of the person and could include indirect actions that appear to the University to be intimidating. The University may add to the terms of no contact within the context of the reported incident that preceded the order or concerns that have arisen during the investigation.

**RESPONDENT'S RIGHTS**

- To be treated with respect by University officials.
- To an investigation and appropriate resolution of all complaints of discrimination and/or harassment made in good faith to the appropriate University official(s).
- To receive written notification if officially accused of violating the University's Nondiscrimination and Anti-Harassment Policy.

- To take advantage of campus support resources (such as Campus Ministry, the University Health and Counseling Centers for students, and Employee Assistance Program services for employees).
- To experience a safe living, educational and work environment.
- To have a support person of his or her choosing, including, but not limited to, a licensed attorney, during any meeting with investigators. The support person cannot be someone who may be called as a witness. The role of the support person is to serve as an advisor. He/she may be present at interviews, hearings and other proceedings, but is not permitted to speak.
- To decline to participate in conflict resolution procedures as the means for resolving an allegation.
    - To receive amnesty for minor student misconduct (such as alcohol or drug violations) that is ancillary to the incident.
    - To be free from retaliation for complaints made, or otherwise participating in an investigation, in good faith.
    - To have complaints heard in substantial accordance with these procedures.
    - To be informed of the outcome/resolution of the complaint and the rationale for the outcome, in writing.
    - The ability to refer to law enforcement and to have assistance.
    - For residential students, the ability to request housing and living accommodations, if appropriate.
    - A "no contact order," if appropriate. A no contact order is an order from a University Official to have no contact with a particular person or persons. Contact is considered any verbal, written, electronic, non-verbal gesture, third party messages, indirect loud talking in the vicinity of the person and could include indirect actions that appear to the University to be intimidating. The University may add to the terms of no contact within the context of the reported incident that preceded the order or concerns that have arisen during the investigation.

**RELATED LINKS**

- Nondiscrimination and Anti-harassment Policy (.pdf)
- University of Dayton Student Handbook

- Mandatory Reporting Policy (.pdf)

**Equity Complaint Process**

Download a PDF version of the Equity Complaint Process (PDF) >>

1.       Introduction

2.      Confidentiality

3.       Pre-Complaint Resolution Efforts and Information

4.      Filing a Complaint and Mandatory Reporting

5.      Complaint Intake

6.      Interim Remedies/Actions

7.      Formal and Informal Complaint Resolution Procedures

7.a.     Informal Complaint Resolution Procedure

7.b.     Formal Complaint Resolution Procedure

7.b.i.     Investigatory Team | Student Cases | All Other Cases

7.b.ii.    The Formal Investigation

7.b.iii.  The Disposition/Resolution | Student Cases | All Other Cases

7.b.iv.  The Appeal Process | Student Cases | All Other Cases

8.       Records

9.      Statement of Rights | Complainant's Rights | Respondent's Rights

10.    Revision

11.    Discretion

12.    Conclusion

13.    History

**Frequently Asked Questions**

                          *                *                *

**33**

## PROTECTION AGAINST RETALIATION

*      *      *

**33. I'm a University employee that filed a complaint using the Equity Complaint Process. I can't be punished for bringing that complaint, can I?**

Bringing a good faith complaint under the Equity Complaint Process is considered protected activity, which means you cannot be retaliated against for bringing that complaint. That means that no adverse action should be taken against you for bringing the complaint. For employees, such types of adverse action include, but are not limited to: dismissal from employment; demotion; loss of salary or benefits; transfer or reassignment; or denial of promotion that otherwise would have been received. For students, such types of adverse action include, but are not limited to: being given a grade not based on class/test performance; denial of access to a course, program, organization or housing; denial of support, services or other assistance given to other students; or denial of an award that otherwise would have been received. If you believe you've been retaliated against for bringing a good faith complaint, please report that immediately to the Equity Compliance Officer. Note that an adverse action is retaliatory only if it is taken because you brought the complaint. The University maintains the right to take action against you for other legitimate reasons, even if you have made a complaint. For example, if you're an employee, your supervisor could give you a negative performance review if that's unrelated to the fact that you brought the complaint. If you're a student, that means the University could sanction you for violating the Code of Conduct, so long as that sanction is unrelated to you bringing the good faith complaint. Note that using the Equity Complaint Process in bad faith, *i.e.*, with deliberately false allegations and malicious accusations of harassment, is not considered protected activity. Also realize that the person you've accused may exercise the right to bring a claim against you if your complaint was in bad faith or malicious, and that would not be considered retaliation.

**34. I understand that, as complainant, witness or aligned party (someone who's a friend to one of the parties), I'm protected against retaliation. What does that mean?**

The University does not tolerate retaliation – basically, adverse action – for bringing a complaint, participating in an investigation, or being aligned with a party.  Submitting a complaint, participating in an investigation (such as by being a witness), or simply being aligned with a party (that is, being friends or associated with either the complainant or respondent) are all considered protected activities which should not subject a person to any type of negative action.  Retaliation itself is considered a violation of the University's Nondiscrimination and Anti-Harassment Policy.  However, if you bring a complaint, it does not relieve you from the regular requirements of your job or being a student, such as performance evaluations or class assignments.